May it please the court, I'm Everett Sanders and I represent Janetta Graham who is the This is a case involving a failure to provide proper medical care. The district court entered a summary judgment. We submit that there are issues of material fact as to whether or not the defendants acted with deliberate indifference as to the serious medical needs of Albert Graham, the deceased, and other inmates with serious medical needs. Also, there's an issue of whether defendants' policy of not training its staff regarding how to provide medical care and medication to patients that come into the jail who already have medical problems or are on medication, and as to how to properly report and document inmates' requests for assistance and medication. And how to properly report and document inmates, where inmates' families bring medication to them. Whether all this was a moving force behind Albert Graham's death. Counsel, I have a question. Obviously this is a terrible thing that happened. The client's husband died. But I have a question about what is the evidence of causation that you put before the court at summary judgment? I don't find that the only expert in the case, the only expert testimony supports any finding of causation. You don't have to win on it, but you just have to present some evidence of it. And so I'm wondering where it is that you believe that there's some evidence of causation. Well, the expert for the defendants testified that the failure to provide medical care, well, let me state it another way. Dr. Taylor determined that if Mr. Graham had been taken to a cardiologist at the time of his incarceration, that this would have been a considerable step toward preserving his life. And he also indicated that when asked about- Where does he say that? Ma'am? Where does he say that? Where does Dr. Taylor say that? Yes, sir. I'm looking at Dr. Taylor's deposition right now, and I don't see that. Can I get my- Or sure, you can wait and tell me on rebuttal if you'd like, if that's easier. Or tell me later, but I don't see that. Let me get it. Okay, whatever you want to do.  Thank you. If Mr. Graham had been taken to a cardiologist at the time he was incarcerated, the cardiologist would have taken appropriate steps to preserve his life. But he didn't see a cardiologist. And Dr. Taylor stated, and I quote, More likely than not, the presence of a cardiac defibrillator will have saved his life. The lack of optimal therapy, optimal meaning drugs, that his cardiologist had put him on, which was a combination of drugs, ACE inhibitors, beta blockers, fluid pills, and dioxin. A lack of combination of drugs contributed to his cardiac demise. This is in the record at 830. Right, but you're not saying that the defendants here didn't give him an internal cardiac defibrillator, are you? I thought you're saying they didn't give him his prescription. Well, they did not give him his prescription. That is correct, Your Honor. But the doctor says that the prescription would not have likely changed the outcome. I'm sorry. Are you saying that they didn't give the internal cardiac defibrillator and that's what they did that caused this? And we're not talking about a little machine that someone runs around with. We're talking about an internal thing you put in to regulate someone. Well, what I'm saying is that they didn't provide him with medical treatment, including providing him with an opportunity to visit. Well, you know, the problem, as you know, is if this were a medical negligence case, you know, you'd be on reasonable footing, I think. The problem is that your case is framed as a matter of county policy of not training the nurse. The nurse wouldn't have anything to do with putting an internal cardiac defibrillator in somebody. She's not capable of doing that. So the concern that we're getting at is what evidence do you have? And, again, I agree it's a completely tragic circumstance. It's just a really, really high standard of liability, deliberate indifference, a county policy of failing to train a nurse, knowing that that's going to lead to death. How does that relate in any way to anything Dr. Taylor said caused Mr. Graham's passing? Okay, well, let me take it step by step. Our position is essentially that the sheriff was deliberately indifferent in terms of the medical needs of the inmates. This is reflected in the fact that he hired somebody in the person of Nurse Johnson who had very limited training and no training in connection with providing medical needs for inmates or satisfying their medical and constitutional needs. It was a totally different ballgame. And if that was true but Nurse Johnson didn't do anything or not do anything that caused the death, then it doesn't matter. So the question about causal nexus is what did Nurse Johnson do or not do that you have some medical evidence caused Mr. Graham's death? Nurse Johnson testified that she understood that Mr. Graham had congestive heart failure. He was taking the medication of Coreg. And I believe her words were that she realized that this was a serious medical condition. Recognizing that it was a serious medical condition combined with the duties and responsibilities, what happened was the sheriff hired her. They virtually just turned over the entire operation to her in terms of whether people should or should not get medical treatment, when they should get it, under what circumstance. With the knowledge that Mr. Graham had a serious problem, she made no effort to try to do anything to alleviate his problem. I thought she saw him daily and gave him medication from, like, March 10th to April 12th. No, ma'am. There was no medication given to him? He was incarcerated November the 9th, 2009. I understand that. But my question is March 10th to his passing in April, was he not then in the medical area where she could see him daily and where medicine was given to him of some sort? The medicine that was prescribed for him. That's right. And the nurse is not in a position to countermand the medicine that's prescribed by some other doctor or nurse practitioner, right? I mean, she's got to do what she's told. She doesn't have the power to prescribe medicine. I understand, but she had the power to decide which physician he went to, and with an understanding and knowledge. And she had received Mr. Graham's medical records from the cardiac care clinic where he had been treated. And she understood the gravity of his medical condition. She didn't send him to a cardiologist. She didn't call his physician to find out about his medication. But she sent him to someone who prescribed this medication, right? Somebody sent him to that person. Somebody prescribed this medication. It wasn't Nurse Johnson, right? It was a nurse practitioner. Okay, so that person prescribed medication, and Nurse Johnson gave it to him. What was she supposed to do differently? She was supposed to send him to a cardiologist with the recognition that he had a history of heart trouble. I mean, if he had a broken leg, to send him to a neurosurgeon may or may not be the thing to do. Or to send him to a chiropractor may or may not be the thing to do. But with her in total control, knowing the gravity of his problem, and not to send him to a cardiologist, or not even to contact his cardiologist. She acknowledged that she knew that the hospital there was more equipped. Okay, but she's not the defendant, and it's not a medical negligence case. That's correct. You have to show it's deliberate indifference by the county to fail to train Nurse Johnson to send serious health patients to a cardiologist. That's your claim, I guess, under 1983. Okay, and do you have a case? Because we have case after case that say not sending him to a specialist is not deliberate indifference. As long as the doctor sees him, or somebody capable like a nurse practitioner. I mean, do you have a case that suggests that the failure to send somebody to a specialist is, in fact, deliberate indifference by the county? Or failure to train someone to send them to a specialist is deliberate indifference by the county? Not per se, but in Brown versus Bryant, it was determined that the errors by the actor that were inconsistent with proper training, and contrary to professional standards, evidence that the policy not to train and or supervise was a moving force that caused the injuries. That's what we have here. A decision not to train. And it's obvious that, I mean, I don't think it's open to interpretation or dispute that no training took place in connection with that, with Nurse Johnson. She testified that not only was she not trained, she didn't even know whether or not they had policies or what those policies were. She was to take someone that has no background and to place them in charge of the medical care of persons who are incarcerated, who cannot fend for themselves, as a demonstration of deliberate indifference on the part of the sheriff who was over the facility. So we're talking about her lack of training regarding how to handle a jail setting, not regarding how to handle medical conditions, right? Nurse Johnson has a lot of training in how to handle medical things for over 30 years. You're just saying she wasn't trained on how to handle, what do you do with an incarcerated person who is seeking care? Is that the issue, the policy on that? I don't concede her that she was that competent in the medical area. She had a very limited medical experience. She had worked in an OB clinic. She had a junior college degree. She had worked with a general practitioner. She had no history, absolutely none, in terms of the rights of prisoners to medical care. She was in a totally different environment for which she had no training. And the sheriff was aware of that, or should have been aware of that, and he placed her there. And to show you the sheriff's attitude about it, when we took his deposition, four years after the death of Mr. Graham, he stated that he had not read the investigative report with respect to Mr. Graham's death. He didn't know whether or not an employee with the sheriff's office or the detention center had been disciplined in connection with the death. And he said, knowing all this supposedly, he said he endorsed the actions of the untrained Nurse Johnson and his untrained staff. That he had told confidence, especially in the jail supervisor and the nurse. That's a reflection of the attitude that exists with respect to the sheriff and the Jones County Adult Detention Center. That's why we have the situation that we have. While this is a different kind of indifference that I'm talking about, but it's an attitudinal reflection. Thank you. You said time for a vote. Yes, ma'am. Thank you. May it please the court. My name is Jason Dare. I'm with the Wyatt, Tarrant & Combs firm. I'm here on behalf of Jones County, Mississippi and Sheriff Hodge in his individual and official capacities. Starting out, I would like to say that this is a very narrow issue that's before the court. It is a failure to train Nurse Carol Johnson. Why that is and the district court correctly held that plaintiff had abandoned certain claims. For instance, plaintiff did not argue before the district court and nor has he argued before this court. That the individual capacity claim against Sheriff Hodge should remain. Even in his brief, page 31, plaintiff concedes that they oppose the motion for summary judgment by focusing on official capacity claims. Can we view the sheriff's lack of interest in this case as evidence of deliberate indifference? The characterization of his attitude at the deposition. Assume for the moment that that's true. You may have a different read on it. But let's assume for the moment that he came in completely disinterested or uninterested in anything. Can we look at that as some evidence of deliberate indifference? With the county and because this case should go under Monell, for instance. And this is not more of a PEMBAR type of case. The county must have actual knowledge of a failure to train. Which, of course, the actual knowledge must occur prior to the defining event, i.e. the death of Mr. Graham. In order for that to be deliberately indifferent and to cause. So what's the answer to Judge Haynes' question? And my answer is no, Your Honor. And I apologize for going around the ballot kind of way. The short answer is no. But your client, he says your client was not respectful and didn't even seem to know anything about this. Do you want to respond to that? I would, absolutely. That would be a concern even if it couldn't be liable based upon that. Sheriff Hodge was asked certain questions during his deposition. And he said that he had not seen the report done by the Mississippi Bureau of Investigations. That in and of itself does not evidence a deliberate indifference against the county, for one. And does not evidence a callousness towards the unfortunate events that occurred here. Namely being Mr. Graham's death. He did testify that he, for instance, does have faith in the nurse's actions. And that he had never had any problems with the nurse before. He also asked individuals about the event. And was under the impression or understanding that his death was by natural causes. Which the plaintiff has apparently conceded today that it was a result of. The jailers did not kill Mr. Graham directly in the sense of like take a knife to him or something of that nature. The question is whether their conduct contributed to his death. And was that deliberate indifference. Those are the questions. I mean, yes, he died a natural death in the sense that he wasn't murdered. But their argument is he'd still be alive had they properly cared for him. The argument is that he would still be alive if he had an internal cardiac defibrillator placed. And that's their sole argument. They don't have an expert to testify to that end at trial. And the only expert that will testify is Dr. Mountain. Well, he says that that would be helpful, that internal cardiac defibrillator. Oh, absolutely. So that's that part. It's just that the drug was what I thought was the case when I asked about causation. Because the drug can't be the cause. That is correct. Failure to get the prescription. But seeing a cardiologist and getting this procedure could have prevented this, according to your expert. If you go back even though to Dr. Moines, the cardiologist that saw Mr. Graham in 2007 and 2008. And the last time Dr. Moines saw Mr. Graham was actually in March of 2008, a full year and a half prior. Dr. Graham, excuse me, Dr. Moines did not view Mr. Graham as a candidate for an internal cardiac defibrillator. Okay, but I'm asking, is there some summary judgment evidence in the record that if he had an internal cardiac defibrillator, it could have helped or stopped this, could have contributed to this not happening? There is. And, in fact, Dr. Taylor testified to that. And so then we have to look at if we have that evidence, was she deliberately indifferent in not getting him to the cardiologist? In two steps. Let me first go with whether Mr. Graham was even a candidate for an internal cardiac defibrillator. But I'm not sure that you get to that. You can put on evidence of that, but you could hash that out. I don't think that we want to look at whether with all the medical evidence he was a candidate and he could have had it and all of that. And I'll point you to one part in the record to where Dr. Taylor testified about whether he was a candidate and then go back into whether or not he should have gone and seen a cardiologist. That's the point we need to get to. Yes, Your Honor. That was on page 565. That's page 36 of Dr. Taylor's deposition. As far as having Mr. Graham see a cardiologist, what Nurse Johnston did initially when she found out about Mr. Graham in or around February 17, 2010, she began attempting to obtain his records. She also knew that she needed to take his blood pressure and did so. She then sent him to Donnie Scoggins. Now, if the court would review Dr. Scoggins' records, specifically page record excerpt 293. The nurse practitioner? The nurse practitioner. The nurse practitioner knew the name of the cardiologist, knew that Mr. Graham had been taking Couric, knew that Mr. Graham had been on Coumadin in the past, and the nurse practitioner did not say, okay, let's take a step back. Let's get him to a cardiologist. What the nurse practitioner did is say, let's put him on blood pressure medication. Let's recheck his blood pressure and let's see what happens then. It's not saying that Nurse Johnston shouldn't have possibly skipped that step, but what she was doing is she was going first to somebody up the chain, so to speak, somebody who could prescribe medication. Is there a case law that says that as long as you're getting medical attention for the person, that you don't have to go to the specialist right away, that it's not deliberate indifference to not go to the specialist? There's plenty of case law on whether or not an individual is acting with subjective deliberate indifference, and it's refusal to treat. Well, and isn't part of the problem here, even in this analysis, that Nurse Johnston is not the defendant. The defendant is the county and the sheriff in the official capacity, whichever. And so you have to take it even further. I mean, if we were talking about Johnston's deliberate indifference and she knowingly kept him from a cardiologist, I mean, you know, we could debate this, but the argument is that they failed to train Johnston. So you have to show deliberate indifference of the county in the way they set things up so that there never would be, I guess, referral to anybody who knew what they were doing. So that's the question, I guess, that we have. That is correct. And if you're going on the training of Nurse Johnston, the plaintiffs have not pointed to a custom policy or practice, anything that is so pervasive in Jones County, as to evidence of custom policy or practice. And what they're attempting to do is go to the single incident exception, which is what Brown was cited for, I presume. However, this court has been very hesitant to apply that single incident exception. Well, so has the Supreme Court. I mean, they reversed our court on that Thompson case. When you have a professional who has training, that single incident, I mean, I don't want to overstate Thompson, but pretty much isn't going to be good enough. And here we have a professional, a nurse, who has training as a nurse. Although it's arguable whether Thompson was, in fact, a single incident, but that's a thing for another day. The court itself was hashing out. The Supreme Court was hashing out. But back to this. So there's no policy that says we don't go to a specialist or we're going to save money and never, ever refer to a specialist. None whatsoever. And is there anything in the record that either that the nurse practitioner was somehow hindered from going to a specialist by some kind of policy in the department or anything like that? None whatsoever. In fact, both Sheriff Hodge and Captain Wall, who was the jail administrator at the time, both testified that with certain answers, even on the booking medical sheet, that individual may not even be booked in. They would go directly to that physician. Sheriff Hodge testified that they routinely send patients to South Central Regional Medical Center, even as it has a or is, in fact, I believe, an entity of Jones County, Mississippi. So they certainly can send any inmate to such a specialist. And certainly Sheriff Hodge has testified to that. Your Honor, there was nothing hindering Nurse Johnson from sending Mr. Graham. She reviewing the records, noting that, for instance, Mr. Graham had not been seen by anyone, literally anyone, in a year and a half. Had not had an active prescription prescribed to him or any medication prescribed to him in over a year and a half. And that's prior to incarceration. That is prior to incarceration. And that's once Nurse Johnson obtained his records. She found all of this out. She then said, okay, let me send him to somebody who can look at him now and make a determination. One, does he need a prescription now? And then that individual can make a further determination. Does he need to go to a specialist? Does he need to do anything above and beyond? Is it deliberately indifferent for the county to rely upon the nurse and nurse practitioner to assess the need of whether Mr. Graham needs to go to a cardiologist or anything else? There is one no requirement that Jones County employ a nurse. The nurse is strictly there to determine this person needs certain medication, or excuse me, this person has prescribed medication. She can't prescribe it. And this person does, in fact, need to go put another way. Does the sheriff have to sit around deciding whether somebody needs to go to a specialist or can the sheriff hire people to assess those questions? And is that deliberately indifferent that he does that? No, Your Honor. The training specifically to the officers, for instance, in facilities that do not have nurses is they go through 96 hours training with the Mississippi Board of Jail Officers Standards and Training. There are numerous courses. The record in this case that the Jones County officers, the curriculum, is at 412. So they go through numerous training and background on being able to recognize a serious medical condition, being able to recognize if an individual is in need of mental or medical treatment, being able to recognize if an inmate is suicidal, and then being able to send them on to someone else. Having a nurse present, someone with 30 years of experience in medicine, is just adding extra insulation to assist the officers in making that determination of where someone needs to go. I believe one of the determinations that Planoff hasn't even pointed to in this case is there's never been a problem with Nurse Johnson being able to do this sufficiently in the past. Is she still employed there? She is, as of right now. In this failure to train case that's currently before the court, there are five elements or factors that the plaintiff needs to put evidence of or on in order to be able to get to trial. That's the inadequacy of the training procedures, the deliberate indifference of the policymaker, the inadequate training was the moving force behind the violation, but the plaintiff must also have evidence of an underlying constitutional violation, and then the proximate cause and causal fact elements. I think what we have been focusing on today are whether there was an underlying constitutional violation. I understand the court has gone to the deliberate indifference of the county by and through Sheriff Hodge, but I don't believe that there has even been proven a defective policy in this case or an inadequacy of the training procedures. The nurse was, in fact, trained as a jail officer in accordance with the Mississippi… Then why didn't she know the procedures? The way she testified is she didn't know the policies and procedures. She knew what they mandated her to do. She knew that the booking officer was supposed to put the booking medical sheet in her box, that she was supposed to review it, that she would either call the inmate's family or call their physician in order to determine if that person needed further medication. She went through in her deposition, step by step, what the policies and procedures mandate that she does. She just didn't know the number of the policies and procedures. So she's saying she didn't know policy number 322 requires X, but she knew what to do. Correct. Okay. And was there any evidence that this failure to put the booking sheet in her box is a continual thing or was this a one aberration? In other words, was there any evidence about whether this glitch in November is a pattern or a one-off? There is absolutely no evidence that this has ever occurred in the past. I have represented numerous departments and numerous sheriff's departments throughout Mississippi, and it seems to be a typical custom for booking officers to place a booking medical sheet in a nurse's box. Sometimes they'll put all of them. Sometimes they'll just put the ones that have yeses checked by them. And then the nurse comes by, picks up every single one of them, because by that time the inmate is out of booking and back in general population sometimes. Sometimes the nurse will then have to go back and find the individual with that booking medical sheet so that he or she can follow up with that inmate. But there's nothing in the record that that time period, I guess from November to February or something, that that was what caused the death. That is correct. So the fact that even if she didn't, she should have got it in November and she didn't start dealing with him until February, there's nothing that shows that that time period is what led to this tragic incident. That is correct, nor is there any evidence that the February to March time period actually caused the death either. There is no evidence before this court on causation, on what any failure to train or that any deliberate indifference on the part of Nurse Johnson actually caused the death of Albert Graham. Specifically going back to Christopher Hillman, who was the booking officer, his failure to put the little sheet of paper in the nurse's box. That is another claim that Judge Sterritt held was abandoned by the plaintiff. The fact that in March, when Mr. Ulmer brought in what he claimed were medications in a bag and that that bag was never even opened up by the officers, the district court has held that those claims were abandoned because they weren't argued at summary judgment. And any claims that either David Hare or Nathan Fared didn't act swiftly enough on April the 5th when Mr. Graham had a cardiac event, those claims were also abandoned. So we aren't strictly looking at the time period from in around middle February to March and what Nurse Johnson's actions were at that time. Which she ordered his medical records and sent him to the nurse practitioner and then visited him every day. And visited him every day starting in March through April. She also testified as to her daily practice that she made rounds throughout the entirety of the jail, for instance. And she would have come into contact with most, if not all, of the inmates. And that Mr. Graham, from November through February, Mr. Graham never made any request to her to see someone or to be provided medication. Your Honors, I thank you for the opportunity to argue here today. And I respectfully request that the summary judgment granted in favor of my clients be affirmed. Thank you. Thank you. May it please the court. There was some mention about that Nurse Johnson saw Mr. Graham on a daily basis. What happened was she discovered sometime between November and December the intake sheet. And on that intake sheet it indicated that he had a previous heart attack, he was taking medication, and he was on disability. Now, she says that if she had had that sheet on the 10th of November when he was brought in, that she would have called his family, she would have talked to him. She would have checked on his medication. She would have found out the physician he was going to. She would have gotten his medical records. When she became aware or got access to the book, she did none of that. She left him in the general population. She acknowledged that he qualified to be in the medical cell, but she left him there. When we took her deposition. When is that that you're talking about? Ma'am? When is that you're talking about? I'm talking about from November when she said that she discovered the booking sheet. From November to March the 10th of the following year, he remained in the general prison population. She had no protocol in terms of how she kept notes or documents. Further, she indicated she had access to the computer. All this information was in the computer. She talked about when we took her deposition, she had a tablet with a wire in it that she made notes in, but she said she didn't make them on a consistent basis. She didn't know when or what she was supposed to put in the computer. She put some things in there and some things she wouldn't. Her conduct in terms of how she went about caring for the medical needs of the prisoners was outrageous. We submit that a jury could reasonably find that based upon outrageous conduct, the absence of training and the conduct. What is the training that she wasn't trained on that led to Mr. Graham's death? Well, she didn't get any training. If she would have trained in what, would it have changed her behavior such that something wouldn't have happened? What is it that she was not trained in that led to the death of Mr. Graham? If she had been trained in connection with the rights of inmates to medical care, that they have a constitutional right and that you just can't neglect them, that they have no control, no control over their environment. They are placed in an environment where she has a responsibility to look after their needs and make sure that they are taken care of. Now, to suggest that there had not been any complaints about her medical condition, I mean about Graham's medical condition, he complained to his wife, he complained to his minister, and it was only after his wife contacted Ms. Walls, who was the jail administrator, did they even get his medical records. This was from November up until sometime in February. And even when she got the medical records, she didn't even send the medical records to the nurse practitioner. Your Honor, we would submit that we did not abandon our claim in connection with our claim with respect to the fact that Ms. Graham's, well let me put it this way. It was our contention in the district court, it was our contention here, that the failure to provide timely and proper medical treatment and the fact that Defendant Hodge acted with deliberate indifference to the medical needs and constitutional rights of the inmate by entrusting care to an untrained neophyte in this area. And he knew, or had reason to believe, that she was not capable of performing the responsibilities for which she had. You need to wrap it up, counsel. Your time has expired. The fact that the statute doesn't require that there be a nurse is inconsequential. You just can't put somebody over there, even though it's not required, and let them do nothing, and endanger the health and welfare of the inmates. Thank you very much, Your Honor. Thank you very much.